[No. 15681.  *En Banc.*  August 13, 1920.]

F. V. HURLEY *et al., Appellants,* v. LIBERTY LAKE COMPANY, *Respondent.*[1]

DEEDS (37)—PROPERTY CONVEYED—APPURTENANCES. Sewage and water systems composed of springs, pumps, tanks, etc., attached to land belonging to a land company are not "appurtenances" within the meaning of deeds of conveyance of lots sold by the company; since real property cannot be appurtenant to real property.

SAME. The free use of sewage and water systems was not intended to pass as an "appurtenance" to lots sold by a land company, where it appears that there was no representation to that effect in advertising circulars used in a vigorous selling campaign holding out alluring inducements to prospective purchasers, and no claim of oral representations to that effect by agents, or any assertion of the right by purchasers for a period of ten years.

WATERS AND WATER COURSES (65)—CONVEYANCES—RIGHTS APPURTENANT TO OTHER ESTATE. Purchasers of lots supplied by a water system installed by the vendor and necessary to the enjoyment of the property cannot claim a free right to the continual flow of the water through the servient premises as an appurtenance, where a greater part of the system did not exist at the time of the conveyances, and the water did not run freely and without control, since the vendor had placed shut-offs at the property lines, thereby expressing its control and ownership in the water.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered July 15, 1919, in favor of the defendant, dismissing an action by property owners to determine rights in and to the use of certain water systems, tried to the court. Affirmed.

*Burcham & Blair,* for appellants.

*Merritt, Lantry & Merritt,* and *Voorhees & Canfield,* for respondent.

MACKINTOSH, J.—Liberty Lake is situated about twelve miles from the city of Spokane and is connected therewith by an electric car line. In 1907, the

[1]Reported in 192 Pac. 4.

respondent's predecessor in interest owned land on the shore of the lake which it platted into lots and streets. The lots were then offered for sale, to be used exclusively for residential purposes. The plan was to make the property an attractive place for summer homes, and contemplated graded streets, electric lights, water and sewer systems. A spring water system was installed, the water flowing by gravity, but later on it was discovered that this supply was not adequate for all purposes and a lake water system was introduced, the water being delivered by pumps, and, at about the same time, the sewer system was built. These three systems cost from $40,000 to $50,000, and were all completed in 1910. More than one-half of the platted lots were sold, and the appellants are the owners of nearly all of them, and made their purchases between the years 1907 and 1910, and at the time of the purchase by most of the appellants, the spring water system was the only system installed. After 1910, there were very few sales of Liberty Lake property.

The deeds of conveyance are uniform, and in each of them the property is described according to the plat and contained this provision, "to have and to hold, together with all the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, to the said party of the second part, his heirs and assigns forever." The appellants went into possession, built residences and improved their properties, which have been used during the summer season at all times since.

After the lake water system was installed, the spring water system was used for only drinking or cooking purposes. These three systems were constructed by laying mains along the streets, with laterals to the lots, paid for by the respondent, and from the lot lines the piping and plumbing were installed at the expense of

the lot owners. The deeds required the lot owner to connect with the sewer when completed, but nowhere in the deed was any provision made for the use by the lot owner of either water system. At the lot lines "shut-offs" and "wastes" were installed by the respondent. During the years in which improvements were being made, no charge was made for water, but upon the completion of the three systems late in 1910, the respondent gave notice that it would make such a charge. Thereafter, and from that time until 1913, inclusive, there was a charge made against each user for the use of both spring and lake water.

Prior to the commencement of the summer season of 1914, on account of financial difficulties in which the respondent was involved (we are using the word respondent to cover the present respondent and its predecessors in interest), the lot owners operated the three systems and divided the cost of operation ratably among themselves. In 1915, the respondent established a season rate for that year and continued the same for three years thereafter.

From 1915 to 1918, there were many conferences between the respondent and the lot owners concerning the respective rights and obligations in regard to the three systems, and in 1919 the lot owners were notified that, commencing that season, they would be required to pay water rates greatly in excess of what they had theretofore been paying. This water rate included cost of maintenance and operation and took into consideration interest on the investment. When notice was received by the lot owners of this raise of rates, this action was instituted, in which the lot owners are seeking to have determined their rights in and to the use of the three systems, and, according to the prayer of their complaint, they are claiming to be the owners

of the three systems, but, as we understand the brief and argument of their counsel, they have now abandoned that position and are now only claiming that they have the right to the use of those systems in the supplying of water without cost, and have abandoned the contention that they are the owners of the pipes, pumps and real estate upon which the systems are located, together with the tanks, pump houses and machinery. They now contend they are entitled to have a decree that, by and upon the purchase of their respective lots, and in consideration of the original purchase price paid, they have received, as appurtenant to their lots, the right to use the three systems, including the necessary water, but are willing to pay for the actual cost of repairs and operation of the systems.

The respondent admits the right of the lot owners to the use of the systems, but claims that it has a right to charge for the water and service a fair and reasonable amount, which is to be determined as are rates charged by corporations engaged in similar public services.

Upon the trial, judgment was entered that the action be dismissed. From this the lot owners have appealed.

The foregoing is a fair statement of the position of the parties, although the pleadings and proof and briefs have taken a great deal wider range, so that the question which we have to decide is not nearly so complicated as the extremely voluminous record and briefs might suggest by their inspection. The lot owners are not seeking to have any rate established for the use or service of the three systems, nor does the respondent deny that the lot owners are entitled to the services afforded by the systems. The question, in its final analysis, then is, Has respondent, for considerations already paid it by appellants in the pur-

chase price of their lots, disposed of its supply of water and its water and sewer systems?

The first matter for consideration is whether the court can enter into a consideration of the question at all, for the reason that the deeds do not mention these systems, and it is claimed by respondents that evidence is inadmissible to vary the terms of the deeds. The lot owners assert that the deeds conveyed the appurtenances, and that extrinsic evidence is admissible for the purpose of determining what was included within that term. As we view the situation, it is unnecessary to pass upon this contention, and we are, for the purposes of this case, willing to assume that evidence is properly admissible for the purpose of explaining the situation at the time the lots were purchased, in order to determine what was included within the expression "appurtenances." That the three systems (speaking of them as they are composed of springs and houses, pumps, piping, septic tanks, etc., attached to the property owned by the respondent) cannot by parol evidence be made appurtenances is sufficiently obvious, for real property cannot be appurtenant to real property.

We will, then, examine the testimony as it was introduced tending to establish that the free use of the systems and the free use of the water were the appurtenances referred to in the conveyances. A great mass of documentary evidence was introduced, consisting of advertising, circulars, prospectii, put out by the respondent in its sales campaign of 1907 and two or three years succeeding. Nowhere in any of this written evidence is there any mention made of free water or the free use of any water or sewer system. The strongest statement in this regard is that the purchasers of property at Liberty Lake will have the use

of streets, sidewalks and public utilities without assessment, and so they have had. The term "assessment" is one in ordinary use and carried to the persons to whose attention it was directed, who were residents of Spokane, its ordinary meaning. They are presumed to be familiar with what assessments for public utilities mean. The common experience of city dwellers, and especially those owning city property, should convey to them, upon reading the statement that there will be no assessments, the meaning that there will be no special assessments levied against the property for the purpose of making the improvements and installing the utilities. If it had been the intention of the respondent to furnish free water or to include in the sales an interest in the spring water system then installed, or the other systems which thereafter were installed, certainly, in as vigorous a campaign as it was making for the purpose of procuring purchasers, it would have mentioned that very extraordinary and alluring inducement to prospective buyers. Taking into consideration the thorough cultivation that the respondent made of its field of operations, it is remarkable, if it was its intention to include with each lot sold the rights which the appellants are now claiming, that some mention was not made, in all of the dozens of printed documents that it issued, of this attractive feature of the proposition which they were pushing.

Oral evidence was introduced, however, from many witnesses among the appellants, who testified that different sales agents and officers of the respondent, in promoting and negotiating sales to them, referred to and promised the free use of the utilities and the free use of the water. The trial court who heard this testimony was not impressed thereby, nor are we, for the

reason that it dealt with statements made some ten years or more prior to the time of trial, and was, therefore, dependent upon human recollection, which is often frail, and especially so when assisted more or less by personal interest. It would be very strange if oral statements such as this were made by the company's officers at the time of sale that no vestige of any such intention was indicated in its written or printed advertisements. Moreover, cross-examination of many of these witnesses weakens the effect of their direct testimony, and leaves the impression that, at most, what the respondent did was to advert to the fact that it had graded the streets, put in a water system, and that the purchasers would not be called upon to pay for those things which one purchasing bare, unplatted property usually has to pay for. The testimony shows appellants are business men, and if they were receiving, at the time of their purchases, the right to use the water and sewer systems and the right to have them operated free of charge, it occurs to us that some one of them, at least, would have had an expression made of such conveyance in the deed which he received, but nowhere is there any intimation that the perpetual free use of the utilities was intended to be conveyed.

Some of the witnesses testified that they were told that, when all of the lots were sold, the water service would be turned over to the lot purchasers free. This testimony was flatly contradicted by the respondent's witnesses, and, moreover, was not properly admissible, in that it was, if true, an effort to have imposed as appurtenant to appellants' lots the physical systems themselves, a position which the appellants have now abandoned, and which, in any event, is untenable for the reason that the systems embraced the springs and

the lands upon which septic tanks, etc., were situated, which were real property and could not be appurtenant.

If parol testimony may be introduced to explain an ambiguity which the appellants claim was presented by the use of the word "appurtenant" (*Norton v. State,* 104 Wash. 248, 176 Pac. 347; *Wright v. Seattle Grocery Co.,* 105 Wash. 383, 177 Pac. 818; *Reed v. Insurance Co.,* 95 U. S. 23; *Ganson v. Madigan,* 15 Wis. 158; *Fayter v. North,* 30. Utah 156, 83 Pac. 742; *Wade v Dorius,* 52 Utah 310, 173 Pac. 564), such evidence cannot make an appurtenance out of real property.

Moreover, in an interpretation of the word "appurtenant," it must be borne in mind that the situation at the time of the conveyances must be considered, for a deed of property with its appurtenances conveys only what is appurtenant at the time of the conveyance, and, as we have noted, nearly all of appellants' lots were conveyed prior to the installation of the sewer and lake water systems, and they surely could not have been included within the term "appurtenant," as they were not then appurtenant, not being in existence. But appellants say that the deeds referred to connections with the sewer system in contemplation, but we cannot see how this would alter the universal rule that, in order for an easement to be appurtenant to real property, it must be in existence at the time the real property is conveyed.

Adverting once more to the testimony in the case, it shows that for years the appellants have never asserted the right which they now claim; that they have paid, probably in the same manner in which every one pays for such services, the charges that have been made by the respondent, and only asserted a right to the free use of the services when the charges became

exceedingly exorbitant. Moreover, as a matter of some weight, it is to be noted that the respondent, in installing its water systems, indicated by the putting in of shut-offs, etc., that it intended to assert a right over the water flowing through its pipes and its ownership thereof.

The appellants contend that the general rule of water courses applies in this case, and that, where an artificial water course runs from one tenement to another and supplies the latter with water, and the latter is sold, there passes to the purchaser the right to have the water flow in the accustomed manner through the servient premises; but in this case, as we have already stated, the lake water system did not exist at the time of the conveyances, and as was said by the trial court:

"If I have a number of lots and a pipe line carrying flowing water freely, to every lot by gravity flow and without any effort or control on my part, a conveyance of any lot would carry with it the right to the continual flow of the water in the pipe, as an appurtenance. That is very much the condition here so far as the spring water is concerned with this important difference; at every lot line the company, when it installed the system, placed a shut-off by means of which it could and did shut off or turn on the water. The water did not run freely and without control but the company, by placing this device in the pipe, expressed its control over and ownership in the water. Therefore, while it serves the lot, while it is necessary to the convenient use and enjoyment of the lot, yet it is not free to go with the lot, for it is owned and confined and controlled by the company—to flow it if it wills and to cease flowing when it desires."

Holding, as we do, that there was no conveyance of these systems or the water by the deeds, those cases cited by the appellants in support of their contention that the respondent is not a public service corporation and that there is merely a matter of contractual rights

involved, become irrelevant. The conduct of the respondent which has given rise to this action is one which does not leave the appellants without relief, as, under the law, the public service commission may investigate the situation and establish such rates as are equitable and just, and if its decision is not satisfactory, there is provision made for its review. But because the respondent has promulgated a rate card which calls for payments apparently unfair, does not present a reason why the lot owners should be decreed to be the owners of the respondent's property.

Under neither the facts nor the law can we come to the conclusion that the lot owners are entitled to more than to receive water from the systems upon the lots and to deposit sewage from their premises in the sewage system, which rights are the same as those given to all patrons of public service corporations engaged in the operation of utilities such as we have in question. The appellants concede that they should be charged for the upkeep, maintenance and depreciation, and the only question in controversy is whether they should pay an additional charge which would give some return upon the investment. This is a matter to be considered by the public service commission.

The judgment of the trial court was correct and is affirmed.

HOLCOMB, C. J., BRIDGES, TOLMAN, PARKER, FULLERTON, MAIN, and MOUNT, JJ., concur.